# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 12-2764

OUIDA WISE, APPELLANT,

V.

ERIC K. SHINSEKI,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Decided April 16, 2014)

*Sean A. Kendall* of Boulder, Colorado, and *Michael E. Wildhaber* of Washington, D.C., were on the brief for the appellant.

*Karen P. Galla*, Appellate Attorney, with whom *Rudrendu Sinhamahapatra*, Appellate Attorney; *Will A. Gunn*, General Counsel; *David L. Quinn*, Acting Assistant General Counsel; and *Gayle E. Strommen*, Deputy Assistant General Counsel, all of Washington, D.C., were on the brief for the appellee.

Before DAVIS, SCHOELEN, and BARTLEY, *Judges*.

BARTLEY, *Judge*: Ouida Wise, surviving spouse of veteran George W. Wise, appeals through counsel a September 12, 2012, Board of Veterans' Appeals (Board) decision denying dependency and indemnity compensation (DIC) based on service connection for the cause of the veteran's death. Record (R.) at 3-25.[1] This appeal is timely and the Court has jurisdiction to review the Board's decision pursuant to 38 U.S.C. §§ 7252(a) and 7266(a). For the reasons that follow, the Court will set aside the appealed portion of the September 2012 Board decision and remand that matter for further development and readjudication consistent with this decision.

---

[1] The Board also denied a claim for DIC under 38 U.S.C. § 1318. R. at 20-25. Because Mrs. Wise indicated in her brief that she did not wish to appeal the Board's decision with respect to that claim (*see* Appellant's Brief (Br.) at 1 n.1), the Court will not address it further. *See DeLisio v. Shinseki*, 25 Vet.App. 45, 47 (2011) (Court's disposition of the case addressed only those portions of the Board decision raised on appeal).

## I. FACTS

Mr. Wise served on active duty in the U.S. Army from April 1943 to December 1945, including service in Europe during World War II. R. at 1065. He landed in Europe during the Normandy invasion and served as a medic in an ambulance unit on campaigns in the Ardennes, northern France, the Rhineland, and central Europe. *Id*.; R. at 1020-21. He treated and evacuated soldiers at the Battle of the Bulge and helped liberate several German concentration camps, including Dachau, Buchenwald, and Landsberg. *See* R. at 471-76, 1018-21. For his service, Mr. Wise was awarded the Bronze Star, the European-African-Middle Eastern Campaign Medal, the World War II Victory Medal, and the Good Conduct Medal. R. at 1065. His service medical records do not reflect any complaints of or treatment for a cardiovascular condition. R. at 1053-60.

Following service, Mr. Wise applied for and was granted service connection for post-traumatic stress disorder (PTSD), initially evaluated as 10% disabling effective September 3, 1985. R. at 1003-04. That grant of service connection was based in part on Mr. Wise's statement that he had been "haunted" by "bad memories" of service for 40 years and that he repressed those memories by working himself to exhaustion so that he did not have time to think about what happened in service. R. at 1021. Those memories included flashbacks of "picking up casualties" throughout World War II, "being [o]n the front lines continuously," and "clean[ing] up concentration camps." R. at 1020. Specifically, Mr. Wise stated that, during the Normandy invasion, he was threatened at gunpoint by a fellow servicemember and, after disembarking from his vehicle, "stepped on a human hand [that] was [lying] there all by itself." *Id*. He also explained that he was in the first ambulance into Bastogne during the Battle of the Bulge and was "less than 100 yards" away from the Malmedy Massacre. R. at 1021. Mr. Wise's PTSD evaluation was subsequently increased to 30%, effective March 21, 1989, and 100%, effective July 24, 2000. *See* R. at 315-19, 984-85.

Mr. Wise died on November 26, 2008. R. at 247. His death certificate lists his immediate cause of death as "arrhythmia due to or as a consequence of" arteriosclerotic cardiovascular disease, congestive heart failure, and chronic obstructive pulmonary disease. *Id*.

In December 2008, Mrs. Wise filed a claim for DIC (R. at 237-44), which was denied by a VA regional office (RO) in May 2009 (R. at 1087-90). Later that month, she submitted a letter from her late husband's VA treating physician, Dr. Michael Bleiden, opining that it was "possible that the

stress from [the veteran's] PTSD contributed to his sudden death." R. at 208. Dr. Bleiden's opinion included an abstract from a 2007 article published in the *Journal of the American Medical Association* (JAMA) that found that male veterans with symptoms of PTSD were "more likely to develop coronary heart disease" and "suggest[ed] that higher levels of [PTSD] symptoms may pose an even greater cardiovascular risk." *Id*. In July 2009, the RO continued to deny entitlement to DIC, rejecting Dr. Bleiden's opinion as speculative. R. at 199-201. Mrs. Wise filed a timely Notice of Disagreement as to that decision (R. at 193) and subsequently perfected her appeal to the Board (R. at 158).

In July 2011, Mrs. Wise testified at a Board hearing (R. at 113-25) and later submitted three Internet articles describing recent research regarding a link between PTSD and heart disease (R. at 129-33). One of those articles, published on the ScienceDaily website, refers to a 2010 study presented at the American Heart Association's (AHA's) 2010 Scientific Sessions that demonstrated that PTSD "more than doubles a veteran's risk of death from any cause and is an independent risk factor for cardiovascular disease." R. at 129.

After further development, Mrs. Wise submitted another letter from Dr. Bleiden, who opined that it was "more likely than not that Mr. Wise's PTSD aided and assisted [in] his death from heart disease, as stress is [a] risk factor for ischemic heart disease." R. at 68. Dr. Bleiden stated that the veteran had "very significant PTSD," as reflected by his "very frequent mental hygiene clinic visits . . . starting in 1986," including visits "every 2 to 4 weeks" between 1995 and 1998. R. at 69; *see* R. at 70-95 (complete list of the veteran's mental health appointments from June 1986 to November 2008). Dr. Bleiden explained that there was "no way that [Mr. Wise] would have needed to be seen so frequently unless he had severe mental health problems." R. at 69.

In May 2012, the Board requested an advisory medical opinion from the Veterans Health Administration (*see* R. at 43), which was prepared by VA staff cardiologist Dr. Thea N. Calkins in July 2012. R. at 46-52. Dr. Calkins began her opinion with the following disclaimer:

> I will preface my remarks by stating that I have practiced as a clinical non invasive cardiologist for approximately the past 20 years. However, I have no formal training or background in [p]sychiatry other than the rudimentary month[-]long [p]sychiatry rotation in medical school more that 25 years ago. And I have pre[]cious little experience treating veterans, having worked briefly as a cardiologist part time at a

3

VA clinic some 12 years ago, and the past few months at my current position. I have never been asked to perform a chart review of this nature.

1 would also like to make the observation that I have been provided with two large folders containing the patient's records for review, but must state that the majority of the paperwork is psychiatry related, as well as including substantial quantities of [bureaucratic] paperwork. What true "medical" records there are contained in the files are for the most part not cardiac related, and certainly incomplete. I say this, as there is evidence of several [c]ardiology appointments listed for the patient dating from 2002 until the patient's death in 2008. However there is no actual documentation provided, i.e., history, physical exams, medical testing, progress notes[,] to lend further insight as to what cardiac issues these appointments were meant to address towards the end of the patient's life.

R. at 46.

Dr. Calkins reviewed the psychiatric records and, after acknowledging that Mr. Wise was "felt to be 100% disabled" from PTSD at the time of his death, she stated: "I feel the medical records did not support that [the veteran's] PTSD was particular[l]y severe or active later in his life, but rather that he suffered from many other psychiatric comor[b]idities." *Id*. She continued: "*From a relative lay person's perspective of psychiatry*, the notes struck me as p[or]traying a fairly well compensated case of PTSD and that the patient was dealing with several other psychiatric issues at the time as well." R. at 47 (emphasis added). She also criticized Dr. Bleiden's medical opinion, accusing him of "not actually read[ing the] mental hygiene clinic notes," which she described as "not support[ing] the diagnosis of severe PTSD, but rather other [psychiatric] issues." *Id*.

Dr. Calkins then outlined Mr. Wise's "conventional" cardiac risk factors, including hypertension, family history of premature vascular disease, obesity, and sedentary lifestyle. R. at 48. She acknowledged the 2010 ScienceDaily article submitted by Mrs. Wise, but stated that it was "probably just an abstract that was presented at the annual heart meetings in 2010, not a reliable peer reviewed piece in the literature." R. at 49. Dr. Calkins noted that Dr. Robert Eckles, former president of the AHA, had called for "much more study" to confirm the findings of the research cited in the ScienceDaily article. *Id*. Dr. Calkins also pointed out that the underlying study "establishes only a possible correlation between PTSD and coronary artery disease, not a causal relationship" and emphasized that "psychosocial factors generally and PTSD specifically[] haven't made it into common clinical practice and are not widely accepted as cardiac risk factors." *Id*. She attached a

4

November 2000 article from the *New England Journal of Medicine* (NEJM) finding a "[l]ack of correlation between psychological factors and subclinical coronary artery disease" (R. at 53-60) and concluded that, although "the jury is still out on this one," PTSD is "by no means . . . considered a conventional cardiovascular risk factor" (R. at 49).

Next, Dr. Calkins chronicled the veteran's cardiovascular history. R. at 49-51. She lamented the "incomplete records regarding the patient[']s care from the year 2000 until his death in 2008," noting that the claims file contained only the appointment list provided by Dr. Bleiden and no corresponding cardiology notes or test results. R. at 51. Nevertheless, Dr. Calkins "assume[d]" that Mr. Wise had sinus node dysfunction requiring implantation of a pacemaker in April 2004, which she described as "not an uncommon clinical scenario for someone of the patient's age." *Id*. She explained that there was "no need or logical reason to invoke PTSD as a contributing factor" to that cardiac condition because Mr. Wise "was in his 80's and had hypertensive heart disease – enough said." *Id*.

Based on the foregoing, Dr. Calkins opined that it was "not at all likely" that PTSD aggravated the veteran's heart disease or hastened his death. R. at 52. She stated that the veteran's PTSD "was not particularly severe, active[,] or troublesome in his later years," but "even if it were, PTSD is not a widely accepted, recognized risk factor for coronary artery disease." *Id*. She explained that, contrary to Mrs. Wise's contentions, the veteran's "inadequately treated hypertension, family history, obesity[,] physical inactivity[,] age[,] and sex are more than plenty to explain any coronary disease he may have developed late in life and would account for his not untimely demise at age 84." *Id*. Dr. Calkins also stated that the veteran "did not have documented coronary artery disease" and that "[h]is death certificate is the first mention of coronary disease." *Id*.

Later in July 2012, Mrs. Wise submitted argument and evidence in response to Dr. Calkins's opinion. R. at 28-42. The evidence included a 2011 article published in *The Open Cardiovascular Medicine Journal* (OCMJ) demonstrating a link between PTSD and an increased risk of hypertension, hyperlipidemia, obesity, cardiovascular disease, and coronary heart disease. R. at 33-39. Notably, the article contained a chart summarizing the "growing number of studies" finding "[p]ositive associations between PTSD and cardiovascular disease (particularly coronary heart disease)." R. at 34; *see* R. at 35-37 (chart).

5

In September 2012, the Board issued the decision currently on appeal, which denied DIC under 38 U.S.C. § 1310 based on service connection for the cause of the veteran's death. R. at 3-25. The Board found that the scientific articles submitted by Mrs. Wise were "of limited probative value" because "a causal relationship [between PTSD and cardiovascular disease] has not been established to the point of being generally accepted in the scientific community" and "the articles cited refer to the early stages of science on the matter." R. at 20. The Board then weighed the competing medical opinions and found that Dr. Calkins's negative linkage opinion was more probative than Dr. Bleiden's positive linkage opinion because the former was based on "the known risk factors for heart disease," whereas the latter was based on "the not yet accepted notion that PTSD causes heart disease." R. at 21. This appeal followed.

## II. ANALYSIS

Mrs. Wise argues that the Board provided an inadequate statement of reasons or bases for denying her DIC claim. Specifically, she contends that the Board failed to (1) consider and discuss Dr. Calkins's competence to offer the requested opinion despite her "admission" that she had no formal training or experience in psychiatry; (2) address other deficiencies in Dr. Calkins's opinion; (3) properly account for the favorable medical treatise evidence of record; and (4) discuss whether the duty to assist obligated VA to attempt to obtain the outstanding records of the veteran's cardiovascular treatment from 2000 to 2008. Appellant's Br. at 12-19. These arguments are persuasive.

The Secretary responds that, with regard to Dr. Calkins's competence, Mrs. Wise's argument must fail because the Board noted that the "expert opinion was obtained to address whether the [v]eteran's fatal artheriosclerotic heart disease was caused by or aggravated by the service-connected PTSD, not about the nature or type of his psychiatric conditions, including PTSD." Secretary's Br. at 12. Further, the Secretary argues that Mrs. Wise should not be permitted to second-guess the expert medical examiner's conclusions, which were based on "her review of the prior medical record and history, and her expertise and judgment" because VA has a presumption of selecting a competent examiner to perform examinations. *Id.* at 13. The Secretary also argues that both Dr. Calkins and the Board addressed the favorable medical treatise evidence of record. *See* R. at 21-22. Finally, the

6

Secretary, in response to Mrs. Wise's argument concerning the veteran's outstanding medical records, states that any error in not attempting to obtain the records is harmless because the veteran's heart treatment prior to 2008 "does not undermine the validity of the examiner's opinion regarding PTSD and it not impacting the heart disease." *Id.* at 22.

Pursuant to 38 U.S.C. § 1310, DIC is paid to a surviving spouse of a qualifying veteran who died from a service-connected disability. A death will be considered service connected where a service-connected disability was either the principal or a contributory cause of death. 38 C.F.R. § 3.312(a) (2013). A disability is the principal cause of death when that disability, "singly or jointly with some other condition, was the immediate or underlying cause of death or was etiologically related thereto." 38 C.F.R. § 3.312(b). To be a contributory cause of death, the disability must have "contributed substantially or materially" to death, "combined to cause death," or "aided or lent assistance to the production of death." 38 C.F.R. § 3.312(c).

In rendering its decision, the Board is required to provide a written statement of reasons or bases for its "findings and conclusions[] on all material issues of fact and law presented on the record." 38 U.S.C. § 7104(d)(1). The statement must be adequate to enable a claimant to understand the precise basis for the Board's decision and to facilitate review in this Court. *Gilbert v. Derwinski*, 1 Vet.App. 49, 57 (1990). To comply with this requirement, the Board must analyze the credibility and probative value of the evidence, account for the evidence that it finds persuasive or unpersuasive, and provide the reasons for its rejection of any material evidence favorable to the claimant. *Caluza v. Brown*, 7 Vet.App. 498, 506 (1995), *aff'd per curiam*, 78 F.3d 604 (Fed. Cir. 1996) (table).

### A. Dr. Calkins's Competence

Mrs. Wise first argues that the Board provided inadequate reasons or bases for its decision because it failed to consider and discuss whether Dr. Calkins was competent to opine on matters requiring psychiatric training and expertise despite her overt "admission" in the text of the medical opinion that she was not qualified to do so. Appellant's Br. at 13-16. The Secretary responds that the Board was entitled to presume that Dr. Calkins was competent to provide the requested opinion and was therefore not obligated to explain its reliance on her opinion. Secretary's Br. at 12-13.

7

The presumption of regularity allows courts, in certain situations and "in the absence of clear evidence to the contrary," to "presume that public officers have properly discharged their duties." *Miley v. Principi*, 366 F.3d 1343, 1347 (Fed. Cir. 2004). Relevant to this appeal, "[i]n the case of competent medical evidence, . . . VA benefits from a presumption that it has properly chosen a person who is qualified to provide a medical opinion in a particular case." *Parks v. Shinseki*, 716 F.3d 581, 585 (Fed. Cir. 2013) (citing *Sickels v. Shinseki*, 643 F.3d 1362, 1366 (Fed. Cir. 2011)). It is presumed that VA followed a regular process that ordinarily results in the selection of a competent medical professional. *Id.* ("Viewed correctly, the presumption [of competence] is not about the person or a job title; it is about the process."). In addition, "one part of the presumption of regularity is that the person selected by . . . VA is qualified by training, education, or experience in the *particular* field." *Id.* (emphasis added).

The purpose of the presumption is "to eliminate the burden [on VA] to produce evidence" of a medical professional's competence to answer the medical questions necessary to decide the claim. *Id.* However, that presumption does not attach when VA's process of selecting a medical professional appears irregular. *See Butler v. Principi*, 244 F.3d 1337, 1340 (Fed. Cir. 2001) (explaining that the presumption of regularity "allows courts to presume that what appears regular is regular"); *Van Valkenburg v. Shinseki*, 23 Vet.App. 113, 116 (2009) (citing *Ashley v. Derwinski*, 2 Vet.App. 307, 309, 1992), for the proposition that, if the facts before the Court do not appear regular, then the presumption does not attach); *cf. United States v. Roses Inc.*,706 F.2d 1563, 1567 (Fed. Cir. 1983) (the presumption of regularity "does not help to sustain an action that on its face appears irregular. . . . [In such a case, t]he presumption operates in reverse. If it appears irregular, it is irregular, and the burden shifts to the proponent to show the contrary.").

Here, the Board sought an expert medical opinion to resolve the issue of whether Mr. Wise's PTSD contributed to the cardiovascular conditions that caused his death. This required the expert to discern the severity of the veteran's PTSD and whether it may have contributed to his demise from cardiovascular disease. R. at 46. Yet Dr. Calkins, whom the Board selected to provide that opinion, expressly disclaimed any expertise in psychiatry, stating that she had "no formal training or background in [p]sychiatry other than the rudimentary month[-]long [p]sychiatry rotation in medical school more that 25 years ago" and calling her view of the psychiatric matters "a relative

lay[]person's perspective." R. at 46-47. These statements suggest irregularity in the Board's process of selecting Dr. Calkins to provide the expert medical opinion because, by Dr. Calkins's own admission, she lacks the necessary expertise to provide that opinion. *See Parks*, 716 F.3d at 585 ("[C]ompetency requires some nexus between qualification and opinion.").

In other words, Dr. Calkins's disclaimer of expertise on psychiatric matters, suggesting irregularity in the Board's selection process, raised the issue of her competence. *See id.* ("In the case of *competent* medical evidence, . . . VA benefits from a presumption that it has properly chosen a person who is qualified to provide a medical opinion in a particular case.") (emphasis added); *Rizzo v. Shinseki*, 580 F.3d 1288, 1292 (Fed. Cir. 2009) (noting that the presumption of competence attached in that case because "the record contains no evidence to call into question the competence" of the medical examiner chosen by the Board); *Cox v. Nicholson*, 20 Vet.App. 563, 569 (2007) (searching the record for evidence "that would cast doubt on [the examiner's] competence and qualifications" and, upon finding none, concluding that the Board did not err in relying on the "implicit presumption of competence"); *see also Robinson v. Peake*, 21 Vet.App. 545, 552-56 (2008) (holding that the Board has a duty to address all issues reasonably raised either by the appellant or the contents of the record), *aff'd sub nom. Robinson v. Shinseki*, 557 F.3d 1355 (Fed. Cir. 2009). The Board's failure to do so renders inadequate its statement of reasons or bases for relying on her opinion. *See Caluza*, 7 Vet.App. at 506; *see also Buchanan v. Nicholson*, 451 F.3d 1331, 1337 (Fed. Cir. 2006) (noting that the Board, as factfinder, is responsible for assessing the credibility, competence, and probative value of evidence).

The Court recognizes that Mrs. Wise did not challenge Dr. Calkins's competence before VA and that, absent such a challenge, the Board is ordinarily not obligated to discuss an examiner's competence. *See Sickels*, 643 F.3d at 1365 (holding that the Board is not required to "give reasons and bases for concluding that a medical examiner is competent unless the issue is raised by the veteran" before VA because such a requirement "would fault the Board for failing to explain its reasoning on unraised issues"); *see also Parks*, 716 F.3d at 585-86 (explaining that "[t]he first step to overcoming the presumption [of competence] is to object, even where . . . the veteran is acting pro se"); *Rizzo*, 580 F.3d at 1291 (holding that, "where . . . the veteran does not challenge a VA medical expert's competence or qualifications before the Board, . . . VA need not affirmatively establish that

9

expert's competency"); *Cox*, 20 Vet.App. at 568-69 (noting that the record before VA contained no "argument or evidence" regarding a nurse practitioner's competence).

However, the medical opinion showed some irregularity that prevented the presumption of competence from attaching and raised the issue of Dr. Calkins's competence, and therefore the facts of this case provide circumstances distinguished from *Parks*, *Sickels*, *Rizzo*, and *Cox*. In those cases, there was no evidence of record creating the appearance of irregularity. *See Parks*, 716 F.3d at 586 (explaining that the record, even when construed sympathetically, did not contain a suggestion "that there was anything improper with the VA's selection of an [advanced registered nurse practitioner]"); *Sickels*, 643 F.3d at 1366 (noting an "absence of clear evidence" of irregularity in a VA medical examination request and rejecting the veteran's belated challenge to the examiner's competence on that basis) (internal quotation marks omitted); *Rizzo*, 580 F.3d at 1291 (acknowledging that the record did not contain any evidence "'that would cast doubt on [the examiner's] competence and qualifications'" (quoting *Cox*, 20 Vet.App. at 569)).

Dr. Calkins, unlike the medical professionals who provided the disputed opinions in those cases, expressly called her own competence into question. R. at 46-47 (characterizing her opinion as "a relative lay person's perspective of psychiatry" and admitting that she had "no formal training or background in [p]sychiatry other than the rudimentary month[-]long [p]sychiatry rotation in medical school more than 25 years ago"). Therefore, the record in this case, unlike the records in *Parks*, *Sickels*, *Rizzo*, and *Cox*, demonstrated irregularity that expressly raised the issue of Dr. Calkins's competence, and it would be unreasonable to allow the Board to ignore this explicit denial of expertise. The Board was thus required to discuss Dr. Calkins's competence before relying on her opinion.

Because neither this Court nor the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) has had the occasion to address the situation presented here–i.e., a medical professional expressly impugning her own competence to answer the questions posed by the Board–the Court concludes that the cases requiring a claimant to raise a competence challenge before VA to trigger the Board's duty to discuss the medical professional's competence are inapposite. Indeed, the reason that the Federal Circuit gave for imposing that requirement–notifying the Board of the perceived shortcoming in the medical professional's competence so that it may "evaluate and determine the

10

validity of the challenge to expert's qualifications," *Bastien v. Shinseki*, 599 F.3d 1301, 1307 (Fed. Cir. 2010)–is not present here because the medical opinion itself alerts the Board as to that shortcoming.

Accordingly, the Court holds that where, as here, a medical professional admits that he or she lacks the expertise necessary to provide the opinion requested by the Board–in this case, expressly deeming her view of the matter as that of a non-expert layperson–the opinion itself creates the appearance of irregularity in the process resulting in the selection of that medical professional that prevents the presumption of competence from attaching, and the Board must therefore address the medical professional's competence before relying on his or her opinion. *See Butler*, *Roses Inc.*, and *Van Valkenburg*, all *supra*. The Board's failure to do so here renders inadequate its statement of reasons or bases for its decision. *See Caluza* and *Gilbert*, both *supra*.

This reasons-or-bases error was prejudicial because, despite Dr. Calkins's self-confessed relative lay perspective on psychiatry and lack of expertise (*see* R. at 46-47), she nevertheless made psychiatric findings that appear to require expertise and that were unfavorable to Mrs. Wise's claim. *See* 38 U.S.C. § 7261(b)(2) (requiring the Court to "take due account of the rule of prejudicial error"). For example, Dr. Calkins reviewed the veteran's psychiatric treatment records and determined that (1) Mr. Wise's PTSD symptoms were not as severe as various VA and private physicians had diagnosed; (2) Mr. Wise's PTSD was not consistent with the 100% evaluation he had been receiving at the time of his death; and (3) his more severe psychiatric symptoms were attributable to non-service-connected mental disorders such as dementia. *See* R. at 46-48.

However, as Dr. Calkins freely admitted, her assessments of the veteran's PTSD and other psychiatric conditions were little more than lay hypotheses on medical matters. *See, e.g.*, R. at 47 ("From a relative lay person's perspective of psychiatry, the notes struck me as p[or]traying a fairly well compensated case of PTSD and that the patient was dealing with several other psychiatric issues at the time as well."). Given Dr. Calkins's admitted lack of expertise in psychiatry, she appears not competent to opine on the complex matter the Board asked her to review. *See Jandreau v. Nicholson*, 492 F.3d 1372, 1377 (Fed. Cir. 2007) (outlining the situations where "[l]ay evidence can be competent and sufficient to establish a diagnosis of a condition," including diagnosing a medically "simple" condition such as a broken leg as opposed to a medically complex condition such as

11

cancer); *see also Kahana v. Shinseki*, 24 Vet.App. 428, 438 (2011) (Lance, J., concurring) ("[A]ny given medical issue is either simple enough to be within the realm of common knowledge for lay claimants and adjudicators or complex enough to require an expert opinion."); *Layno v. Brown*, 6 Vet.App. 465, 469-70 (1994) (explaining that, "[a]s a general matter, in order for any testimony to be probative of any fact, the witness must be competent to testify as to the facts under consideration," which includes possessing personal knowledge of the disputed fact and the expertise necessary to testify as to that fact); 38 C.F.R. § 3.159(a)(1) (2013) (defining "competent medical evidence" as "evidence provided by a person who is qualified through education, training, or experience to offer medical diagnoses, statements, or opinions"). Remand is therefore warranted. *See Tucker v. West*, 11 Vet.App. 369, 374 (1998) (holding that remand is the appropriate remedy "where the Board has incorrectly applied the law, failed to provide an adequate statement of reasons or bases for its determinations, or where the record is otherwise inadequate").

### B. Deficiencies in Dr. Calkins's Opinion

Mrs. Wise next argues that the Board's statement of reasons or bases for its decision was inadequate because the Board failed to account for various deficiencies in Dr. Calkins's reasoning for her negative linkage opinion. Appellant's Br. at 14, 17. The Court agrees.

The record contains a list of Mr. Wise's VA medical appointments, including cardiology appointments, between June 1986 and November 2008. R. at 70-95. However, as Dr. Calkins pointed out, the record does not contain any cardiovascular treatment records between 2000 and 2008. *See* R. at 46 (noting that "there is no actual documentation provided[–]i.e., history, physical exams, medical testing, progress notes[–]to lend further insight as to what cardiac issues the[ listed VA cardiology appointments] were meant to address towards the end of the patient's life"), 49 (stating that she "cannot support the contention that the patient even had significant coronary disease during his lifetime" based on the "admittedly incomplete" cardiology records in the claims file), 51 (explaining that she was "faced with the problem of incomplete records regarding the patient[']s cardiac care from the year 2000 until his death in 2008," including a lack of "cardiology consultants' notes and test results" from that period).

Despite the lack of cardiovascular treatment records, Dr. Calkins repeatedly stated, based on a negative cardiac catheterization study in 1993, that Mr. Wise did not have coronary artery disease

12

(CAD). R. at 49, 51-52. Not only was that study conducted 15 years before the veteran's death, but his death certificate found that he suffered from arteriosclerotic cardiovascular disease, a type of coronary artery disease,[2] during his lifetime. R. at 247 (listing that condition as a contributing cause of death). The relevant question becomes, to the extent that Mr. Wise developed coronary artery disease later in life, was it aggravated by his PTSD? However, neither Dr. Calkins, nor–more importantly–the Board, acknowledged or addressed that question. Instead, Dr. Calkins offered a negative linkage opinion based on medical records that significantly predated the veteran's death and showed a clean bill of cardiovascular health (*see* R. at 51-52 (twice stating in her negative linkage opinion that the veteran did not have coronary artery disease as of 1993 and questioning whether the notation of coronary artery disease on the death certification had "any basis in history, autopsy")), and the Board implicitly approved this approach without discussing its deficiencies.

In addition, Dr. Calkins's conclusion that PTSD is "not widely accepted" as a cardiac risk factor was based, in part, on a 2000 NEJM article that she attached "to refute" the 2007 JAMA article referenced by Dr. Bleiden in his positive linkage opinion. R. at 49. However, the 2000 NEJM article was published seven years *before* the 2007 JAMA article and eight years before the veteran's death. *Compare* R. at 54-59 (2000 NEJM article), *with* R. at 208 (abstract of the 2007 JAMA article). Yet, neither Dr. Calkins nor the Board discussed the 2007 JAMA article or explained why a 12-year-old article was more representative of the current state of medical science on this issue than the 2007 article referenced by Dr. Bleiden.

These apparent shortcomings and discrepancies raise questions as to the adequacy of Dr. Calkins's opinion, and the Board was required to discuss them before relying on that opinion to decide Mrs. Wise's DIC claim. *See Owens v. Brown*, 7 Vet.App. 429, 433 (1995) (Board must provide an adequate statement of reasons or bases for relying on a medical opinion). The Board's failure to do so further justifies remand. *See Tucker*, *supra*.

### C. Outstanding Medical Records

Mrs. Wise next argues that the Board provided inadequate reasons or bases for its decision because the Board, in concluding that VA satisfied its duty to assist, did not address whether VA was

---

[2] "Coronary artery disease" is "atherosclerosis of the coronary arteries." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 531 (32d ed. 2012). "Atherosclerosis" is "a common form of arteriosclerosis." *Id*. at 172.

required to attempt to obtain the veteran's outstanding records of cardiovascular treatment from 2000 to 2008. Appellant's Br. at 18-19. This argument is also persuasive.

The Secretary has a duty to assist claimants in developing their claims. 38 U.S.C. § 5103A. The duty to assist in a DIC claim includes the duty to make "reasonable efforts to assist a claimant in obtaining evidence necessary to substantiate the claimant's claim." 38 U.S.C. § 5103A(a)(1); *see DeLaRosa v. Peake*, 515 F.3d 1319, 1322 (Fed. Cir. 2008) (holding that section 5103A(a) imposes on VA a general assistance requirement "in all cases" for VA benefits). "[W]here . . . VA is on notice that records supporting an appellant's claim may exist, . . . VA has a duty to assist the appellant to locate and obtain these records." *Solomon v. Brown*, 6 Vet.App. 396, 401 (1994); *see Ivey v. Derwinski*, 2 Vet.App. 320, 323 (1992) (holding that evidence of record before VA may "raise[] enough notice of pertinent private medical records to trigger the duty to assist"). The Board must support its determination that VA satisfied its duty to assist with an adequate statement of reasons or bases. *See Trafter v. Shinseki*, 26 Vet.App. 267, 282-83 (2013); *Daves v. Nicholson*, 21 Vet.App. 46, 51 (2007).

The record contains a list of Mr. Wise's VA medical appointments, including cardiology appointments, between June 1986 and November 2008, but, as noted by Dr. Calkins and discussed above, it does not contain any cardiovascular treatment records between 2000 and 2008. R. at 70-95. Dr. Calkins's opinion put the Board on notice that VA medical records relevant to the veteran's cause of death were outstanding, thereby triggering VA's duty to assist Mrs. Wise in obtaining those records. *See Soloman* and *Ivey, supra*. Yet, the record does not reflect that the Board made any effort to attempt to obtain those records, and the Board's discussion of the duty to assist in this regard is so terse and vague as to be essentially meaningless. *See* R. at 8 (noting that the RO has obtained postservice VA medial records "to the extent possible"). Accordingly, the Court concludes that the Board provided an inadequate statement of reasons or bases for concluding that VA had satisfied its duty to assist. *See Gilbert, supra*.

D. "General Acceptance in the Medical Community" and the Benefit of the Doubt

Although the Court has already determined that remand is necessary, the Court will nevertheless address Mrs. Wise's additional reasons-or-bases argument to ensure a proper decision by the Board on remand. *See Quirin v. Shinseki*, 22 Vet.App. 390, 396 (2009) (holding that, to

provide guidance to the Board, the Court may address an appellant's other arguments after determining that remand is warranted). Specifically, Mrs. Wise argues that the Board failed to adequately account for the potentially favorable medical literature of record. Appellant's Br. at 17-18. The record contains various articles and studies indicating a link between PTSD and increased risk of cardiovascular disease. R. at 33-39, 129-33, 208. The Board considered "the scientific studies and articles in this case" and found them to be "of limited probative value" because "a causal relationship [between PTSD and cardiovascular disease] has not been established to the point of being generally accepted in the scientific community" and the studies submitted by Mrs. Wise "refer to the early stages of science on the matter, rather than a generally accepted medical principle." R. at 20. The foregoing raises the issue of whether the Board, in rejecting the potentially favorable medical literature of record because it espoused a medical principle that was not yet "generally accepted" in the scientific community, ran afoul of the benefit of the doubt rule.

The general standard of proof in veterans benefits cases–the "benefit of the doubt" rule–provides that, "[w]hen there is an approximate balance of positive and negative evidence regarding any issue material to the determination of a matter, the Secretary shall give the benefit of the doubt to the claimant." 38 U.S.C. § 5107(b). The statute's implementing regulation restates this rule in terms of "reasonable doubt" and provides further detail on the mechanics of that rule:

> When, after careful consideration of all procurable and assembled data, a reasonable doubt arises regarding service origin, the degree of disability, or any other point, such doubt will be resolved in favor of the claimant. By reasonable doubt is meant one which exists because of an approximate balance of positive and negative evidence which does not satisfactorily prove or disprove the claim. It is a substantial doubt and one within the range of probability as distinguished from pure speculation or remote possibility.

38 C.F.R. § 3.102 (2013). Evidence on an issue is in "approximate balance" when the evidence for and against a finding on that issue is "almost exactly or nearly equal" or "too close to call." *Ortiz v. Principi*, 274 F.3d 1361, 1364-65 (Fed. Cir. 2001); *see Gilbert*, 1 Vet.App. at 55-56 (analogizing the benefit of the doubt rule to "the rule deeply embedded in sandlot baseball that 'the tie goes to the runner'").

This "unique" standard of proof is lower than any other in contemporary American jurisprudence and reflects "the high esteem in which our nation holds those who have served in the

Armed Services." *Gilbert*, 1 Vet.App. at 54; *see Henderson v. Shinseki*, 131 S.Ct. 1197, 1205-06 (2011) (noting that "[t]he contrast between ordinary civil litigation . . . and the system that Congress created for the adjudication of veterans' benefits claims could hardly be more dramatic"). By requiring only an "approximate balance of positive and negative evidence" to prove any issue material to a claim for veterans benefits, 38 U.S.C. § 5107(b), the nation, "in recognition of our debt to our veterans," has "taken upon itself the risk of error" in awarding such benefits. *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 755 (1982) ("[I]n any given proceeding, the minimum standard of proof tolerated by the due process requirement reflects not only the weight of the private and public interests affected, but also a societal judgment about how the risk of error should be distributed between the litigants."). Thus, "[b]y tradition and by statute, the benefit of the doubt belongs to the veteran." *Gilbert*, 1 Vet.App. at 54.

In keeping with the benefit of the doubt rule, Congress has not mandated that a medical principle have reached the level of scientific consensus to support a claim for VA benefits. Instead, Congress, through the enactment of section 5107(b)'s low standard of proof for all issues material to a claim for veterans benefits, has authorized VA to resolve a scientific or medical question in the claimant's favor so long as the evidence for and against that question is in "approximate balance." Imposing a higher standard of proof would be counter to the benefit of the doubt rule. *See Jones v. Shinseki*, 23 Vet.App. 382, 388 n.1 (2010) (differentiating between legal and medical standards of proof, but declining to address that issue further except to "note that in the veterans benefits system the benefit of the doubt as to any issue material to resolution of the claim goes to the veteran if the evidence is in equipoise and the burden of nonpersuasion is with VA" (internal citations and quotation marks omitted)); *Rucker v. Brown*, 10 Vet.App. 67, 73 (1997) (noting that the extent to which a theory is accepted in the scientific community is a factor the Board may use in evaluating scientific evidence, but reminding the Board that, "in a merits adjudication, the evidence need only reach equipoise"); *Bielby v. Brown*, 7 Vet.App. 260, 267 (1994) (remanding for the Board to consider medical treatises supporting a theory that the Board rejected "as lacking support in the medical community"); 38 C.F.R. § 3.328(c) (2013) (authorizing VA to seek an independent medical opinion when, inter alia, "the issue under consideration . . . has generated such controversy in the medical community at large[] as to justify solicitation of [such] medical opinion"); *cf. Hodges v.*

16

*Sec'y of Dep't of Health & Human Servs.*, 9 F.3d 958, 961-62 (Fed. Cir. 1993) (acknowledging that special masters evaluating claims filed under the National Childhood Vaccine Injury Act, 42 U.S.C. §§ 300aa-10 to 300aa-34, were bound by the "preponderance of the evidence" standard of proof set forth in the Act and could not demand greater proof with respect to causation).

Thus, even if Dr. Calkins were correct that PTSD is not "generally accepted" in the medical community as a risk factor for cardiovascular disease, this did not relieve the Board of its obligation to consider and discuss the potentially favorable medical literature of record that supported Mrs. Wise's theory of entitlement to DIC and to apply the correct standard of proof for determining that issue. *See Caluza*, 7 Vet.App. at 506; 38 C.F.R. § 3.159(a)(1) (characterizing "statements conveying sound medical principles found in medical treatises" as competent medical evidence that the Board is required to address); *see also Sacks v. West*, 11 Vet.App. 314, 317 (1998) (explaining that treatise evidence "can provide important support when combined with an opinion of a medical professional"); *cf. Hodges*, 9 F.3d at 971 (Newman, J., dissenting) (explaining that, when a factfinder must decide a scientific question on an issue that has not yet obtained scientific consensus, "the correct legal response is to recognize the uncertain state of present diagnostic knowledge, to take cognizance of the range of epidemiologic results that have been reported, and to decide each case on its specific facts, in accordance with the burden of proof set in the statute"). This is not to say that the Board is precluded from considering the extent to which a scientific theory is accepted in the scientific community when evaluating the evidence of record, *see Rucker, supra*; this is simply to make clear that the Board, when evaluating that evidence, cannot demand a level of acceptance in the scientific community greater than the level of proof required by the benefit of the doubt rule.

As noted above, the record contains a 2000 NEJM article used by Dr. Calkins to reject a causal connection between PTSD and cardiovascular disease (R. at 54-59), as well as several articles linking PTSD to an increased risk of cardiovascular disease (R. at 33-39, 129-33, 208). These contradicting articles indicate that the evidence on that issue may be in approximate balance, triggering the Board's statutory duty to accord Mrs. Wise the benefit of the doubt.[3] *See* 38 U.S.C.

---

[3]Of course, evidence on an issue material to a claim "must be at least in equipoise" and, if an issue "cannot be determined without resort to speculation, then it has not been proven to the level of equipoise" and the benefit of the doubt rule does not apply. *Chotta v. Peake*, 22 Vet.App. 80, 86 (2008); *see* 38 C.F.R. § 3.102 (reasonable doubt is "a substantial doubt and one within the range of probability as distinguished from pure speculation or remote possibility").

§ 5107(b); *Ortiz*, *supra*.  However, the Board did not describe its weighing of the record evidence for and against a causal connection between PTSD and cardiovascular disease, nor did it address whether Mrs. Wise was entitled to the benefit of the doubt *on that issue*.  Instead, the Board conclusorily placed greater weight on Dr. Calkins's opinion because the "notion" that "PTSD causes heart disease" was not generally accepted in the medical community.  R. at 20-21.  The Board then found that, because the preponderance of the evidence was against the claim, the benefit of the doubt did not apply.  R. at 22.  The Board's failure to give adequate reasons or bases for its weighing of the conflicting articles and consideration of the benefit of the doubt rule as it pertains to the issue of causation frustrates judicial review and provides a further basis for remand.  *See Tucker* and *Gilbert,* both *supra*.

## III.  CONCLUSION

Upon consideration of the foregoing, the appealed portion of the September 12, 2012, Board decision is SET ASIDE, and that matter is REMANDED for further development and readjudication consistent with this decision.

Mrs. Wise is free on remand to present any additional argument and evidence pertaining to this matter in accordance with *Kutscherousky v. West*, 12 Vet.App. 369, 372-73 (1999) (per curiam order).  *See Kay v. Principi*, 16 Vet.App. 529, 534 (2002).  The Court reminds the Board that "[a] remand is meant to entail a critical examination of the justification for [the Board's] decision," *Fletcher v. Derwinski*, 1 Vet.App. 394, 397 (1991), and must be performed in an expeditious manner in accordance with 38 U.S.C. § 7112.