# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 18-0765

CLIFTON ARLINE, APPELLANT,

V.

DENIS MCDONOUGH,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued June 19, 2020                                        Decided July 1, 2021)

*April Donahower*, of Providence, Rhode Island, for the appellant.

*Mark D. Vichich*, Appellate Attorney, with whom *Catherine C. Mitrano,* Acting General Counsel; *Mary Ann Flynn*, Chief Counsel; *Sarah W. Fusina*, Deputy Chief Counsel; and *Jeremy Y. Wong*, Appellate Attorney, were on the brief, all of Washington, D.C., for the appellee.

Before BARTLEY, *Chief Judge*, and PIETSCH and FALVEY, *Judges*.

FALVEY, *Judge*, filed the opinion of the Court. BARTLEY, *Chief Judge*, filed an opinion concurring in part and dissenting in part.

FALVEY, *Judge*: Air Force veteran Clifton Arline appeals through counsel a January 26, 2018, Board of Veterans' Appeals decision denying a rating higher than 50% for service-connected schizophrenia before December 7, 2011, and a total disability rating based on individual unemployability (TDIU). The Court has jurisdiction over this timely appeal. *See* 38 U.S.C. §§ 7252(a), 7266(a).

We referred this case to a panel of the Court, with oral argument, to address the meaning of the phrase "employment in a protected environment" in 38 C.F.R. § 4.16(a). Although we have given the Secretary ample opportunity to define this phrase, *see Cantrell v. Shulkin*, 28 Vet.App. 382, 390 (2017), he has not done so and thus this issue continues to arise. Unfortunately, the panel cannot reach this issue here because the Board did not clearly err in finding Mr. Arline's descriptions of his workplace accommodations not credible and that he was not unemployable. After careful consideration of the record, briefs, and issues presented at oral argument, we must reluctantly leave the definition of that phrase for another day.

Because the Board did not err in finding Mr. Arline not credible and that the evidence weighed against finding him unemployable, we affirm the part of the Board decision denying TDIU. But because the Board provided inadequate reasons or bases for denying a rating higher than 50% for schizophrenia before December 7, 2011, we set aside that part of the Board decision and remand that matter for readjudication.

## I. FACTS AND PROCEDURAL HISTORY

Mr. Arline served on active duty from January 1971 to August 1975. Record (R.) at 905. Relevant to this appeal, he is service connected for schizophrenia rated as 10% disabling effective August 14, 1975; 50% disabling effective May 17, 2006; and 70% disabling effective December 7, 2011. R. at 580, 1196. His combined rating for all service-connected disabilities has been 80% since December 7, 2011. R. at 27, 782, 1196.

As to his schizophrenia rating, during VA psychiatric treatment before December 2011, Mr. Arline sometimes reported auditory and visual hallucinations and sometimes denied them. *Compare, e.g.*, R. at 1447-48, 1531 (denials in December 2007 and October and December 2010), *with* R. at 1407, 1435, 1438, 1445, 1449, 1483, 2100, 2181, 2202 (reports of hallucinations in July and November 2006, December 2007, September 2009, October 2010, and January and March 2011). When VA neuropsychologist Dr. Gregg Nigl asked Mr. Arline in January 2011 about the discrepancies in his reports to VA treating psychiatrist Dr. Ramesh Jasti, the veteran said that he had denied hallucinations before because he "didn't want to seem crazy." R. at 1435; *see also* R. at 1402 (December 2011 VA examination report noting that the veteran "fears reporting frequency [of hallucinations] to psychiatrist"), 1406 (December 2011 VA examiner's opinion that the veteran's condition had worsened or "perhaps was worse than expected due to [v]eteran's difficulty and reluctance to share symptoms accurately for fear of being seen as 'crazy'"), 604-05 (veteran's April 2016 Board hearing testimony that, although he experienced hallucinations, he did not always report them because he did not want people to think he was strange). Dr. Nigl stressed "[t]he importance of . . . consistently being open and honest regarding the presence of symptoms (i.e. auditory hallucinations) with his psychiatrist," R. at 1438, and two months later, Mr. Arline told Dr. Jasti that, twice per week, he would hear his name being called when he was home alone, R. at 1430.

Along with auditory and visual hallucinations, the record reflects that, throughout the period on appeal, Mr. Arline experienced memory problems, difficulty concentrating, anxiety, depression, mood swings, feelings of worthlessness, paranoia, hypervigilance, delusions of people trying to hurt him, panic attacks, suicidal thoughts, hyperstartle reaction, social isolation, trouble sleeping, and cognitive difficulties. *See, e.g.*, R. at 58, 597, 600, 733, 1402, 1435-36, 1444, 1446, 1449, 1531, 1923, 2134.

As to employment, Mr. Arline worked for the U.S. Defense Logistics Agency (DLA) at the Defense Supply Center of Columbus (DSCC)—first as a janitor, then as a machine specialist, and finally as a parts expediter—from November 1976 to January 2014. R. at 58 (serving as a parts expediter for 23 years), 1097.

Between July 2006 and December 2011, the veteran reported fear of losing his job; being overwhelmed and anxious at work; taking time off because he was stressed and anxious and because he did not want to deal with people; a supportive supervisor who was also a veteran; his supervisor and coworkers completed some of his work because of his memory problems and difficulty understanding complex commands and new material; and falling asleep at work. R. at 1403 (December 2011 VA examination noting that he sometimes missed a week of work at a time), 1449, 1486, 1923-24, 2099 (December 2007 treatment note reflecting that the veteran had been missing work a "few times" per month), 2173, 2181, 2201-02; *see* R. at 3-4 (Mr. Arline had a 50% schizophrenia rating for this period and, as we will discuss below, the Board provided inadequate reasons or bases for why a higher schizophrenia rating for that period was not warranted).

In 2014, Mr. Arline retired, having worked for DSCC for 38 years. Although he stated that his employer told him to retire or be terminated, R. at 54, his employer reported that his retirement was regular, R. at 21; *see also* R. at 1097 (July 2015 request for employment information). After he retired, Mr. Arline volunteered for 20 hours per week at a local VA facility, stating that he could perform that role because there was no set schedule or expectations regarding his performance. R. at 54-55; *see also* R. at 607-08 (testifying at an April 25, 2016, Board hearing that he needed to use a "cheat sheet" for important information while volunteering, which included pushing patients in wheelchairs to different floors, because the facility was large).

In September 2015, a VA examiner opined that the veteran could complete simple repetitive tasks in an environment that did not require more than superficial social interactions

3

because he had done so for DLA for over 37 years and was currently volunteering with VA. R. at 653.

In a June 2017 affidavit to VA, Mr. Arline stated that his schizophrenia severely affected his ability to work and that he was only able to keep his job because his supervisor allowed him to take naps during lunch and work a flexible schedule with multiple breaks, and because his supervisor did not discipline him for those breaks or the errors he made. R. at 54 (also noting irritability and being rude to coworkers). He alleged that "if it were not for the profound accommodations I was provided with, I would not have been able to maintain my employment as long as I did." *Id*. (stating that he was given an ultimatum to "take [] retirement or be fired").

In September 2017, Ms. Fran Grunden, a private vocational expert, reviewed Mr. Arline's VA claims file and conducted a 30-minute telephone interview with him. R. at 19; R. at 57. He reported to her that he had trouble concentrating and experienced fatigue throughout his time at the DSCC, but that those symptoms worsened around 2004, causing him to make more frequent mistakes and miss work 3 to 4 times per month. R. at 58. Mr. Arline also asserted that his coworkers would often assist him with tasks or do his work for him. R. at 57-58. Ms. Grunden opined that it was more than likely that Mr. Arline could not secure and follow substantially gainful employment since at least 2006. R. at 61. She stated that the accommodations that the DSCC made for the veteran were "not reasonable in most competitive occupations" because such accommodations "cost an employer time, money, and morale among other workers, all of which place an unreasonable burden on the employer." *Id*. Ms. Grunden explained that, without those accommodations, Mr. Arline would not have been able to maintain his job, "rendering it a protected work environment." *Id*. Ultimately, she concluded that the veteran's schizophrenia had rendered him "unemployable in any occupation requiring sedentary or greater physical demands." *Id*.

In the January 2018 decision on appeal, the Board denied a schizophrenia rating higher than 50% before December 7, 2011, because it found that, although the evidence for that period demonstrated that he had deficiencies in mood, it did not reflect similar deficiencies in judgment, thinking, family relations, or work. R. at 10. The Board also found the veteran's inconsistent reports of visual and auditory hallucinations not credible. R. at 12.

The Board likewise denied TDIU because it concluded that Mr. Arline's schizophrenia did not preclude substantially gainful employment and that his employment with DLA was not

marginal. R. at 14-27. The Board found that Mr. Arline's employment did not qualify as "in a protected environment" given his employment history. R. at 21. It found the vocational opinion less probative because it was based, in part, on the veteran's non-credible statements. R. at 25-26. Although the Board acknowledged that Mr. Arline's service-connected disabilities impaired his employability, it found that his combined 80% rating for that period contemplated this impairment. R. at 26 (noting that significant impairment in occupational functioning is not interchangeable with unemployability).

Mr. Arline appealed the Board decision and, in July 2019, the Court issued a memorandum decision vacating the portion of the decision denying an increased schizophrenia rating higher than 50% before December 7, 2011, and affirming the portion of the Board decision denying TDIU. Mr. Arline timely filed a motion for reconsideration or panel review. In January 2020, the Court granted the motion, withdrew the July 2019 memorandum decision, and submitted the case for panel consideration.

## II. TDIU

### A. Legal Landscape

We begin with Mr. Arline's entitlement to TDIU. TDIU will be awarded when VA determines that a veteran cannot secure or follow a substantially gainful occupation because of service-connected disabilities. 38 C.F.R. § 4.16(a) (2020); *see Cantrell*, 28 Vet.App. at 387. Marginal employment is not considered substantially gainful, meaning that veterans who are engaged in marginal employment may be awarded TDIU even though they are working. 38 C.F.R. § 4.16(a); *see Ortiz-Valles v. McDonald*, 28 Vet.App. 65, 71 (2016).

Section 4.16(a) specifies that "marginal employment generally shall be deemed to exist when a veteran's earned annual income does not exceed the amount established by the U.S. Department of Commerce, Bureau of the Census, as the poverty threshold for one person." 38 C.F.R. § 4.16(a).[1] The regulation further provides that "[m]arginal employment may also be held to exist, on a facts found basis (includes but is not limited to employment in a protected environment such as a family business or sheltered workshop), when earned annual income

---

[1] Although the term "marginal employment" appears only in § 4.16(a), the Court in *Cantrell* observed that "nothing in the regulation" precludes VA "from determining that marginal employment exists for the purposes of referring a case for consideration of extraschedular TDIU under § 4.16(b)." 28 Vet.App. at 388 n.5.

exceeds the poverty threshold." *Id.* The issue here is the meaning of "employment in a protected environment" in § 4.16(a).[2]

The Court has considered this issue before. In *Cantrell*, we concluded that the phrase "employment in a protected environment" was ambiguous because VA did not define it in § 4.16 or any surrounding regulation, no other VA compensation regulation used the term, and the nonexhaustive list of examples that VA provided did not definitively elucidate its meaning. 28 Vet.App. at 390. When the Court in *Cantrell* asked the Secretary to provide a definition to resolve the ambiguity, he declined to do so; instead, he stated that "VA has purposely chosen not to prescribe a precise definition of 'protected environment,' allowing the factfinder to make the determination on a case-by-case basis." *Id.* (internal quotations omitted). The Court rejected this "ambiguity by design" rationale and refused to afford deference to the Secretary's "we know it when we see it" definition, finding it inconceivable that "the hundreds of VA adjudicators across the country [would be able to] uniformly and consistently apply that undefined term without guidance from the Secretary." *Id.* Although Mr. Cantrell asked the Court to define "employment in a protected environment" for the Secretary, we declined to do so at that time, opting instead to give the Secretary an opportunity to develop his own definition. *Id.* at 392-93. Several years passed without a definition from the Secretary, until he was compelled to define "employment in a protected environment" in defense of the Board decision here.

## B. The Parties' TDIU Arguments

This brings us to the parties' TDIU arguments. Mr. Arline asks the Court to reverse the Board's denial of TDIU because the vocational opinion that the veteran was employed in a protected environment was the only competent evidence on that question and because the Board provided legally invalid reasons for discounting the opinion. He contends that the Board did not adequately explain its finding that his reported work accommodations were not credible and relied on incompetent evidence to repudiate the vocational opinion. Appellant's Brief (Br.) at 18-29; Reply Br. at 8-15. We will discuss Mr. Arline's specific arguments in this regard below. As part of his request for reversal, Mr. Arline implores the Court to define "employment in a protected

---

[2] The Court notes that "employment in a protected environment" is not the only type of facts-found marginal employment contemplated by the regulation. *See* 38 C.F.R. § 4.16(a) (specifying that facts-found marginal employment "includes *but is not limited to* employment in a protected environment" (emphasis added)). But because Mr. Arline has not argued that he is entitled to an award of TDIU based on any other type of marginal employment, our analysis focuses solely on "employment in a protected environment." *See Grivois v. Brown*, 6 Vet.App. 136, 138 (1994) (explaining that the Court may find abandoned issues not raised on appeal).

6

environment" as "a job in which extraordinary accommodations compensate for a veteran's inability to perform the essential functions of his [or her] job." Motion (Mot.) for Panel Review at 3.[3] In his view, evidence of "[e]xtraordinary, excessive, or unreasonable accommodations [that] allow a person with disabilities to continue working even if he [or she] falls outside the protection of the Americans with Disabilities Act [(ADA)]" can establish that a veteran is employed in a protected environment because such accommodations "'impose an undue hardship'" on the employer. *Id*. (quoting 42 U.S.C. § 12112(b)(5)).

The Secretary responds that the Board's adverse credibility determination has a plausible basis in the record and was adequately explained. He therefore argues that the Board permissibly discounted the vocational opinion based on Mr. Arline's incredible reports of workplace accommodations and that the veteran otherwise fails to show remandable, much less reversible, error in the Board's TDIU analysis. Secretary's Br. at 18-29. The Secretary asserts that, given that failure, there is no reason for the Court to address the definition of "employment in a protected environment." Secretary's Supplemental (Supp.) Br. at 1-3. But, if we were to reach that question, the Secretary urges the Court to hold that the phrase is unambiguous and means employment in "a non-competitive workplace separated from workplaces in the open labor market and in which hiring and compensation decisions are motivated by a benevolent attitude toward the employee." *Id*. at 4. Alternatively, if the holding in *Cantrell* that the phrase is ambiguous binds us, he asks the Court to defer to his proposed definition because it is his official interpretation based on the text, structure, history, and purpose of § 4.16; represents his fair and considered judgment on the matter; and falls within an area in which he has substantial expertise. *Id*. at 13-15. To the extent that his position here differs from the one taken in *Cantrell*, the Secretary requests that the Court consider that this definition is his attempt to address the concerns outlined in that case. *Id*. at 15.

Mr. Arline agrees that "employment in a protected environment" is unambiguous but disputes the Secretary's proposed definition, arguing that it means employment in "an environment in which a veteran is protected from the economic consequences of his or her inability to perform the physical or mental tasks required by substantially gainful employment." Appellant's Response (Resp.) to Supp. Br. at 8-9; *see id*. at 13 (suggesting that "unreasonable accommodations that allow

---

[3] Because we do not find that the Board erred in its credibility and employability determinations, the Court does not reach the question of what "employment in a protected environment" means. Yet we outline the parties' arguments about this matter to summarize what the Court considered.

7

a veteran to continue working at a substantially gainful level" show that employment is in a protected environment). He contends that the Secretary's definition essentially equates a protected environment with a sheltered workshop in contravention of the regulation's plain language and impermissibly focuses on the nature of the workplace and the employer's benevolence instead of the individual veteran's capabilities. *Id*. at 9-11. Finally, Mr. Arline urges the Court that, if we were to find the disputed phrase ambiguous, the Secretary's proposed definition should not receive *Auer v. Robbins*, 519 U.S. 452 (1997), deference because it is merely a convenient litigating position and not the product of his fair and considered judgment, as evidenced by his refusal to define the term in *Cantrell*. *Id*. at 12.

## C. The Board's TDIU Determinations

### *1. Relevant Law*

The Board, as factfinder, is responsible for assessing the credibility of evidence and assigning it appropriate weight. *See Buchanan v. Nicholson*, 451 F.3d 1331, 1337 (Fed. Cir. 2006); *Wise v Shinseki*, 26 Vet.App. 517, 526 (2014). To do so, the Board may consider factors such as facial plausibility, bias, self-interest, and consistency with other evidence of record. *See Southall-Norman v. McDonald*, 28 Vet.App. 346, 355 (2016) (citing *Buchanan*, 451 F.3d at 1337); *Caluza v. Brown*, 7 Vet.App. 498, 511 (1995), *aff'd per curiam*, 78 F.3d 604 (Fed. Cir. 1996)).

As with any finding on a material issue of fact and law presented on the record, the Board must support its determinations with adequate reasons or bases that enable the claimant to understand the precise basis for that determination and facilitate review in this Court. 38 U.S.C. § 7104(d)(1); *Southall-Norman*, 28 Vet.App. at 355; *Gilbert v. Derwinski*, 1 Vet.App. 49, 57 (1990). To comply with this requirement, the Board must analyze the credibility and probative value of evidence, account for evidence that it finds persuasive or unpersuasive, and provide reasons for its rejection of material evidence favorable to the claimant. *Caluza*, 7 Vet.App. at 506.

We review the Board's credibility determination and other factual findings under the "clearly erroneous" standard. *Butts v. Brown*, 5 Vet.App. 532, 534 (1993) (en banc). "A factual finding 'is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Hersey v. Derwinski*, 2 Vet.App. 91, 94 (1992) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Further, this "Court is not permitted to substitute its judgment for

that of the [Board] on issues of material fact; if there is a 'plausible' basis in the record for the factual determinations of the [Board] . . . we cannot overturn them." *Gilbert*, 1 Vet.App. at 53.

## 2. Credibility and Employability

The Court finds that there was a plausible basis in the record for the Board's credibility and employability determinations and that it did not clearly err in denying TDIU. *See Butts*, 5 Vet.App. at 534; *Gilbert*, 1 Vet.App. at 53. Mr. Arline stated that his employer made profound workplace accommodations, including allowing a work schedule that avoided contact with co-workers, sleeping during lunch breaks, oversleeping breaks without repercussions, having multiple breaks during the work day, taking off work 3 to 4 days a month without repercussions, and overlooking numerous errors he made in ordering parts. R. at 18; *see also* R. at 54. On one hand, he asserted an inability to get along with coworkers, yet on the other hand he stated that his coworkers and supervisor covered for him and protected him from losing a job he could not perform. R. at 23. The Board recognized that Mr. Arline's schizophrenia, rated at 50% from May 2006 and 70% from December 2011, affected his ability to do his job; however, the Board found Mr. Arline's statements as to the extent of his employer's protection from his having to perform his job duties strained the limits of credibility. R. at 24. Reading the decision as a whole, the Board determined that Mr. Arline's workplace accommodation descriptions were not credible because they lacked facial plausibility and were inconsistent with other independent evidence. *See Jansen v. Principi*, 15 Vet. App. 370, 379 (2001) (per curiam); *Caluza,* 7 Vet.App. at 511 (explaining that the Board's assessment of the credibility of lay statements involves considering factors such as facial implausibility, bias, self-interest, and consistency with other evidence of record).

In denying TDIU, the Board weighed Mr. Arline's lay statements against his stable 37-year, full-time DLA career, during which he spent 23 years in the same position ordering parts for the U.S. Department of Defense (DOD); his "regular retirement" from that job; and the September 2015 VA examiner's assessment that he could complete simple repetitive tasks in an environment that did not require more than superficial social interactions because he had done so for decades at his DLA job and was now volunteering at a local VA facility. R. at 21-25.

These determinations were supported by the record. *See Gilbert*, 1 Vet.App. at 53. Further, the Board provided adequate reasons or bases for these determinations, explaining that it found that the length, nature, and reason for termination of Mr. Arline's employment weighed against

9

finding the veteran's reports of workplace accommodations credible and that he was unemployable. *See Gilbert*, 1 Vet.App. at 57.

### 3. The Vocational Opinion

We now move to Mr. Arline's specific arguments, many concerning the vocational opinion in which Ms. Grunden opined that it was more than likely that the veteran could not secure and follow substantially gainful employment since at least 2006. R. at 6.1.

Mr. Arline first asserts that the Board's reasoning for rejecting the vocational opinion is circular. Appellant's Br. at 19. He argues that the Board's conclusion that his employment was not in a protected environment was the sole reason it gave less weight to the vocational opinion, but that this conclusion is one that the Board could reach only after weighing the evidence, which included the vocational opinion. *Id*. In other words, Mr. Arline contends that the Board had to complete its evaluation of the substance of the vocational opinion before reaching any conclusions about the facts on which that report was based. Yet this would conflict with precedent. *See Reonal v. Brown*, 5 Vet.App. 458, 460-61 (1993) ("An opinion based upon an inaccurate factual premise has no probative value."). Although Mr. Arline asserts that the Board did not identify any evidence that contradicted the vocational opinion, Appellant's Br. at 19, the Board's conclusion that the opinion depended on inaccurate facts is a sufficient basis for determining that the opinion lacked probative value. *See id*. And again, as we will discuss below, there was other competent vocational evidence of record on which the Board relied.

Mr. Arline next argues that the Board mischaracterized the vocational expert's use of the term "unreasonable" by equating it with the term "implausible." Appellant's Br. at 20-21. In discussing the severity of his interpersonal functioning, the Board first points to an apparent contradiction in Mr. Arline's statements, noting that he reported an inability to get along with coworkers while also asserting that his supervisor supported him and that his coworkers covered tasks that he could not complete. R. at 23. The Board stated that his account suggested that his supervisor and coworkers were risking their own professional objectives and expanding their own workloads simply to protect Mr. Arline from losing a job he allegedly could not adequately perform. *Id*. The Board then noted that the vocational report acknowledged that the type of accommodations the veteran described cost an employer time, money, and morale among other coworkers, which would place an "unreasonable" burden on an employer. R. at 23-24. Ultimately, the Board found not credible Mr. Arline's account of his supervisor and coworkers providing him

extensive protection from having to perform his duties and instead determined that his stable 37-year, full-time employment history within DOD, which ended with regular retirement, weighed against finding him unemployable. R. at 23-24.

We do not find that the Board mischaracterized Ms. Grunden's use of the term "unreasonable" nor did the Board interpret this part of her opinion to mean that no employer would provide the accommodations the veteran reported. Rather, the Board reviewed the specific evidence of Mr. Arline's case—including the length, nature, and reason for termination of his employment and his seemingly contradictory statements that he did not get along with his coworkers but that those same coworkers also supported him and covered for him—and found that his statements of the alleged accommodations provided by his employer were not credible. Although the Board referenced Ms. Grunden's statement that those types of accommodations would place an "unreasonable" burden on the employer as support for its conclusion, the Board was not equating that term with "implausible." Instead, the Board was simply noting that the vocational expert's statement that the reported accommodations would cost an employer time, money, and morale among other coworkers bolstered the conclusion that the Board was drawing from the other evidence.

Intertwined with his arguments about the vocational opinion, Mr. Arline also asserts that the Board was inconsistent in its treatment of his reported accommodations. Appellant's Br. at 20. He notes that the Board found that his work errors, coworkers' assistance with tasks, and his use of accumulated leave to cover schizophrenia-related absences did not suggest extraordinary accommodations demonstrating unemployability, R. at 22, but then also found that his reported accommodations strained the limits of credibility, R. at 23-24. Mr. Arline questions how his coworkers' assistance can be both a nonextraordinary accommodation and an accommodation that strains credibility. But, as stated, the Board plausibly determined and adequately explained why it found Mr. Arline's reported accommodations (specifically, his coworkers' assistance) not credible. R. at 23-24 (the Board noting the veteran's seemingly contradictory statements that he did not get along with coworkers but that those same coworkers also supported him and covered tasks for him and finding more persuasive the length, nature, and reason for termination of Mr. Arline's employment); *see Gilbert*, 1 Vet.App. at 53, 57. Although the Board could have better explained this, when read as whole, *see Prickett v. Nicholson*, 20 Vet.App. 370, 375 (2006), the Board decision sufficiently conveyed that it found Mr. Arline's statements about this particular

11

accommodation not credible, no matter if it was extraordinary, and thus relied on other evidence to assess his employability.

### 4. Other Evidence

Next, contrary to Mr. Arline's contentions, Appellant's Br. at 18-29; Appellant's Resp. to Supp. Br. at 1-3, the vocational opinion was not the only competent evidence of record for determining whether the veteran was employed "in a protected environment" and the Board relied on more than its own speculation about what happens in a workplace for finding the veteran's reported accommodations not credible. The Board determined that Mr. Arline's employment did not qualify as "in a protected environment" given the nature of his DLA employment as an expediter responsible for ordering parts for DOD, that he worked at the DSCC for over 37 years, that he took a regular retirement, and the September 2015 VA examiner's assessment. R. at 21, 25. Although a vocational expert did not provide this evidence, it is still evidence relevant to assessing TDIU. And the Board may consider the nature, length, and reason for termination of employment when assessing whether that employment was "in a protected environment." *See Buchanan*, 451 F.3d at 1337. In fact, when making TDIU determinations, the Board must consider a veteran's work history. *Withers v. Wilkie*, 30 Vet.App. 139, 144 (2018) ("When conducting a TDIU analysis, the Board 'must take into account the individual veteran's education, training, and work history.'"), *quoting Pederson v. McDonald*, 27 Vet.App. 276, 286 (2015) (en banc). Thus, the Board did not err in reviewing and relying on Mr. Arline's work history (which, here, happened to be adverse vocational evidence) when deciding whether he was employed "in a protected environment."

And it was within the Board's purview to consider the consistency of the veteran's statements regarding accommodations with other evidence of record, such as that showing the nature, length, and reason for termination of employment, as well as the September 2015 VA examiner's opinion. *See* R. at 26 (the Board finding that the veteran's account of workplace protections strained the limits of credibility, while his stable, long-term, full-time federal employment that ended with voluntary retirement showed that his service-connected disabilities did not render him unemployable); *see also Buchanan*, 451 F.3d at 1337; *Southall-Norman*, 28 Vet.App. at 355.

To the extent that Mr. Arline argues that the Board improperly required corroboration of his lay statements, *see* Appellant's Reply Br. at 9-10 (arguing that his statements regarding his work environment did not require corroboration); Appellant's Supp. Br. at 3 (asserting that the

12

Board rejected the vocational opinion based on his "uncorroborated—yet uncontradicted—reports"); R. at 24 (the Board stating that, because it found Mr. Arline not credible, his account of his work environment was not established on his uncorroborated reports alone), the Court discerns no such error because, when the decision is read as whole, *see Prickett*, 20 Vet.App. at 375, it is clear that the Board found his statements not credible based on his employment history and not simply because there was no other evidence supporting his report of accommodations, *see Buchanan*, 451 F.3d at 1337 (holding that the Board may not find that lay statements lack credibility "merely because they were not corroborated by contemporaneous . . . records").

*5.* Miller *and* Kahana

Next, Mr. Arline argues that the Board exceeded its own competence and that the reasoning in *Miller v. Wilkie*, 32 Vet.App. 249 (2020), and *Kahana v. Shinseki*, 24 Vet.App. 428 (2011), which concern medical opinions, should apply to vocational opinions. Appellant's Resp. to Supp. Br. at 4-5. He asserts that "expert evidence can be necessary to deciding whether a lay-reported event plausibly occurred." *Id.* at 5.

First, *Miller* does not require expert evidence when assessing credibility; rather, it held that the Board *may* weigh such evidence when addressing credibility. 32 Vet.App. at 259; *see also Smith v. Shinseki*, 647 F.3d 1380, 1386 (Fed. Cir. 2011) ("[T]he fact that such an expert is sometimes necessary does not suggest that a vocational expert is always required for this purpose, and we hold that such an expert is not invariably required."). We do not dispute that vocational counselors have expertise in their fields and that, when there is a vocational opinion of record, the Board may consider it when assessing credibility. But being permitted to review expert evidence when determining credibility differs from expert evidence being necessary or required for the Board to make such a decision.

Second, Mr. Arline does not explain how vocational expertise is equivalent to medical expertise so that the Court should extend the reasoning in *Kahana* to encompass vocational opinions. Vocational matters do not involve the same complex issues as medical matters. *See Kahana*, 24 Vet.App. at 434 (citing the next two cases); *Jandreau v. Nicholson*, 492 F.3d 1372, 1377 (Fed. Cir. 2007) (explaining that a layperson is competent to identify a simple condition like a broken leg, but that medical evidence is likely required for a complex condition like cancer); *Colvin v. Derwinski*, 1 Vet. App. 171, 175 (1991) (finding that the Board could not rely on its own unsubstantiated medical conclusions regarding multiple sclerosis). And, because answering those

13

complex medical questions generally requires specific training and Board members are not medical professionals with that requisite training, it follows that medical determinations are outside their competence. *See Kahana*, 24 Vet. App. at 434; 38 C.F.R. § 3.159(a)(1) (2020) (stating that competent medical evidence is provided by a person who is qualified through education, training, or experience to offer medical diagnoses, statements, or opinions). Thus, without a convincing argument for doing so, we cannot make the leap that a vocational opinion is the same as a medical opinion, particularly where such a finding may have the unintended consequence of requiring a vocational opinion in all TDIU cases.

In addition, although not a vocational expert, every Board member has experience in a work environment. To be clear, we are not, as our dissenting colleague suggests, stating that a Board member may find a veteran not credible simply based on that Board member's personal work experiences. But when a Board member draws upon common knowledge or general experience about work environments when assessing TDIU evidence, that Board member, contrary to Mr. Arline's contention, Appellant's Resp. to Supp. Br. at 3, does not assume the role of a competing vocational expert, particularly where the Board bases its determination on other evidence of record. *Cf. Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923) (holding that expert opinions are admissible if the question involved does not lie in the range of common experience or common knowledge); *Van Blargan v. Williams Hosp. Corp.*, 754 F. Supp. 246, 249 (D.P.R. 1991) (finding that the "determination of when experts may be used involves 'the common sense inquiry as to whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved'" and holding that the issue of hotel security did not require an expert because this issue dealt with common occurrences that the jurors knew about through their daily life experiences).

Further, statutes and regulations outline how the federal employment environment operates. For example, the "Federal work force should be used efficiently and effectively" and "[e]mployees should be retained on the basis of the adequacy of their performance, inadequate performance should be corrected, and employees should be separated who cannot or will not improve their performance to meet required standards." 5 U.S.C. § 2301(b)(5)-(6); *see* 5 C.F.R. § 2635.101(a), (b)(5) (providing that "each [public service] employee shall respect and adhere to the principles of ethical conduct" and "put forth honest effort in the performance of their duties").

Moreover, each government agency must develop a performance appraisal system to assess performance, encourage employee participation in establishing performance standards, and support, among other things, reassigning, reducing in grade, or removing underperforming employees. *See* 5 U.S.C. § 4302; *see also* 5 U.S.C. § 4301 (defining "unacceptable performance" as the "performance of an employee which fails to meet established performance standards in one or more critical elements of such employee's position"); 5 U.S.C. § 4303 (noting the required actions where an employee's performance is unacceptable). And, although a government agency may not discriminate against an employee based on disability and must provide that employee with reasonable accommodations, that employee still must be qualified for the job and able to complete the job's essential functions. *See* 42 U.S.C. § 12112; 29 C.F.R. § 1630.2(m) (providing that the "term 'qualified,' with respect to an individual with a disability, means that the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position").

Given these standards for federal employment, we do not find that the Board erred in deciding that Mr. Arline's reported accommodations were not credible or in relying on the nature, length, and reason for termination of employment to ultimately determine that he was not unemployable. Mr. Arline essentially asked the Board (comprised of members of the federal workforce) to believe that, despite these standards, DLA allowed him not to perform the essential functions of his job; allowed his supervisor to overlook his poor performance, to not correct it, and to provide him accommodations beyond what the Americans with Disabilities Act would require, despite him not seeking any reasonable accommodations, *see* R. at 1097 (when asked if any concessions were made for Mr. Arline for his disability, DSCC responded "N/A"); and did not reassign him, reduce his grade, or remove him after years of poor performance. The Board did not err in declining to do so.

In sum, we find unpersuasive Mr. Arline's argument that once he presented the vocational expert's opinion, the Board could not deny his claim without producing evidence that he could perform other than marginal work, Appellant's Resp. to Supp. Br. at 6-7, particularly given that the Board properly relied on other competent evidence to find Mr. Arline not credible and to ultimately deny TDIU.

## 6. Retirement

Mr. Arline also argues that there was no inconsistency between DLA's notation of regular retirement and his own statement that DLA forced him to either retire or be fired, and that the Board did not analyze why DLA would have been expected to state that his retirement was involuntary when asked to provide the reason for termination of employment. Appellant's Br. at 23-24 (citing *Fountain v. McDonald*, 27 Vet.App. 258, 273 (2015), presumably for the proposition that the Board had to lay a proper foundation).

But the veteran's argument is speculative and reflects his own interpretation of the evidence: "The form 21-4129 [request for employment information] invites an employer to specify '[i]f [the Veteran] retired on disability.' . . . Because Mr. Arline was eligible by age to retire . . . it is reasonable to infer that use of the descriptor "[r]egular" was intended to indicate that he did not retire on disability." Appellant's Br. at 24. Yet the VA form asks the employer "if veteran is not working, state reason for termination of employment. If retired on disability, please specify." R. at 1097. It does not narrow the question regarding termination to only retirement based on disability. And Mr. Arline's speculation about possible scenarios under which DLA may have forced him to retire yet reported to VA that his retirement was "regular" is not sufficient to demonstrate that the Board's weighing of that evidence was clearly erroneous.

Thus, the Board's determination that Mr. Arline's retirement was regular and voluntary has a plausible basis in the record, *see Gilbert*, 1 Vet.App. at 53, and Mr. Arline's argument essentially amounts to a disagreement with the Board's characterization of the evidence, *see Owens v. Brown*, 7 Vet.App. 429, 433 (1995) (finding that it is the province of the Board to weigh and assess the evidence). The Board, as fact-finder, may find more probative the employer's notation of regular retirement (and characterize that notation as reflecting voluntary termination) and find less probative the veteran's statement about being forced to retire or be fired where the Board generally found his TDIU contentions not credible. *See Owens*, 7 Vet.App. at 433.

## 7. September 2015 VA Examination

As to the September 2015 VA examination, Mr. Arline is correct that a TDIU determination is not medical in nature and it is not the province of medical examiners to opine on whether a veteran's service-connected disabilities preclude substantially gainful employment. Appellant's Resp. to Supp. Br. at 7; *see Delrio v. Wilkie*, 32 Vet.App. 232, 242–43 (2019) (noting that the ultimate determination of whether a veteran meets the TDIU standards belongs to the VA

16

adjudicator). But "[o]f course, medical examiners may assist VA adjudicators in making that determination by providing detailed descriptions of the veteran's disabilities and any functional limitations that they cause." *Id*. at 243. And although the Board may also not delegate its credibility assessment to an outside expert, expert evidence "may play a role in the Board's evaluation of credibility." *Miller*, 32 Vet.App. at 259. If a medical expert "explains that the veteran's assertions are generally inconsistent with medical knowledge or implausible, the Board can weigh that when addressing the veteran's credibility." *Id*.

The September 2015 VA examiner opined that the veteran could complete simple repetitive tasks in an environment that did not require more than superficial social interactions because he had done so for DLA for decades and was currently volunteering with a local VA facility. R. at 653. Contrary to Mr. Arline's suggestion, the examiner did not determine he could partake in substantially gainful employment; rather, the examiner, after considering the veteran's schizophrenia and its effects, described his functional limitations. *See Delrio*, 32 Vet. at 243. And the examiner's opinion was not founded on an unqualified assumption that Mr. Arline's employment was not marginal. Appellant's Supp. Br. at 7. Instead, the examiner was simply explaining that the veteran had, indeed, worked in a job consistent with his functional limitations for over 37 years. R. at 653.

Because Mr. Arline has not shown that the September 2015 VA examination was not competent concerning the description of his disability and functional limitations or that it depended on an unqualified vocational assumption, the Board did not err in considering it when assessing credibility and weighing it against other evidence of record, including Mr. Arline's statements and the vocational opinion. *See Miller*, 32 Vet.App. at 259; *Delrio*, 32 Vet. at 243; *cf. Monzingo v. Shinseki*, 26 Vet.App. 97, 105 (2012) (holding that the Board may rely on an opinion if the examiner's reasoning is discernable). Similarly, although the Board may consider a vocational expert's opinion when assessing credibility, a credibility determination is ultimately the adjudicator's to make, and the veracity of a veteran's statements is not proven simply because a vocational expert does not question them. *See Miller*, 32 Vet.App. at 259; *Delrio*, 32 Vet. at 242-43; *see also* Appellant's Resp. to Supp. Br. at 5.

### 8. Volunteering and Church Activities

Mr. Arline also argues that the Board improperly relied on his volunteering with VA and being active in his church to find that he could engage in substantially gainful employment.

Appellant's Br. at 27. As to Mr. Arline's participation in church activities, the Board mentioned this only once in its TDIU analysis, R. at 21, among several others factors on which the Board more heavily relied to deny TDIU, R. at 21-26 (discussing the nature, length, and reason for termination of employment and the September 2015 VA examination). Thus, we discern no error in this regard.

As to Mr. Arline's volunteering with VA, he argues that the Board's finding that he volunteered "regularly" was incorrect because he reported to Ms. Grunden that he only did so if he felt like it. Appellant's Br. at 27. But in a July 2017 statement, Mr. Arline also reported that he volunteered for 20 hours per week at a VA facility. R. at 54-55 (stating that he could perform that role because there was no set schedule or expectations regarding his performance). Thus, there is a plausible basis in the record—the veteran himself stating that he volunteered 20 hours per week—for the Board to find that he did so regularly. *See Gilbert*, 1 Vet.App. at 53; *see also Owens*, 7 Vet.App. at 433 (noting that it is the Board's role to weigh and assess the evidence).

And we note that, although the Board more heavily relied on factors other than his volunteering to find that he could engage in substantially gainful employment, *see* R. at 21-26; *see also Owens*, 7 Vet.App. at 433, the Board did consider Mr. Arline's volunteer activities when assessing his statements about memory impairment. But the Board did so because, while discussing TDIU during a hearing, the veteran testified that he needed to use a "cheat sheet" for important information while volunteering because the facility was large. R. at 21-22 (the Board noting that a neuropsychiatric examiner had suggested employing techniques to aid with his memory, such as writing tasks down, and that the veteran had used such a memory aid to assist him while volunteering); *id*. (the Board then finding that the VA facility permitting Mr. Arline to use an informational sheet to keep track of his location does not establish that he suffers from memory loss that would prohibit his engagement in substantially gainful employment); R. at 607-08 (hearing testimony); *see Caluza*, 7 Vet.App. at 506 (the Board must account for evidence that it finds persuasive or unpersuasive).

### 9. Memory Impairment

Mr. Arline's arguments about memory impairment are in the section of his briefs about an increased schizophrenia rating, Appellant's Br. at 15-16 (noting the part of the Board decision questioning the credibility of his statement that he forgot relatives' names and asserting that memory impairment did not need to preclude him from daily life to warrant a 70% rating) and is

only mentioned once in the TDIU section, *id.* at 27 ("But, as discussed below, the Board's assessment of Mr. Arline's memory impairment relied on nonevidence in the form of invalid test scores."); *see* Appellant's Reply Br. 6-8 (discussing memory impairment only in the section about the increased schizophrenia rating and mentioning the test results in the context of whether he had trouble driving or performing daily activities); Appellant's Resp. to Supp. Br. at 6-7 (same); *see also Locklear v. Nicholson*, 20 Vet.App. 410, 416 (2006) (holding that the Court will not entertain underdeveloped arguments).

To the extent that we can discern an argument about memory impairment and TDIU, the Board acknowledged that the veteran experienced memory impairment but found the level of impairment he described not credible because it was unsupported by consistent test results and was self-serving. R. at 21-22; *see Southall-Norman*, 28 Vet.App. at 355 (holding that, when assessing credibility, the Board may consider factors such as self-interest and consistency with other evidence of record). The January 2011 examiner opined that Mr. Arline offered suboptimal effort because the cognitive tests showed an impairment level that was far more than the functional limitations that the veteran and his wife had reported. R. at 1437.

The Board appears to have reconciled its conclusion with the positive portions of the January 2011 examination showing that the veteran had memory loss. *See* R. at 1437 (the examiner stating that it was possible to have both memory defects and exaggerated defects and acknowledging the lay statements about impairment). The Board did not dispute that Mr. Arline had memory loss. R. at 22 ("While the Board finds no reason to doubt that the [v]eteran experiences impairment of his short term memory, the matter on appeal requires the Board to consider whether that impairment is shown to be of such severity as to contribute to rendering the [v]eteran unemployable as [he] contends."). Rather, the Board plausibly found that the severity that the veteran recently reported was not credible and his suboptimal efforts during the January 2011 examination support this determination. *See Gilbert*, 1 Vet.App. at 53. In essence, Mr. Arline's more recent statement about memory loss contradicted his and his wife's prior statements about this symptom and the examiner's conclusion about this exaggerated defect confirmed this. *See Owens*, 7 Vet.App. at 433 (holding that it is within the Board's province to weigh the evidence, including contradictory statements). Although the Board could have been more thorough in its analysis, its explanation was sufficient for judicial review. *See Gilbert*, 1 Vet.App. at 57.

19

*10. Summary*

After careful review of Mr. Arline's arguments and the record, we do not find that the Board clearly erred in its credibility and employability determinations. We also find that it provided adequate reasons or bases for those determinations. The Board considered the vocational opinion in assessing credibility and unemployability, but ultimately found more persuasive the length, nature, and reason for termination of Mr. Arline's employment when making those determinations. It is not only within the Board's purview to do so, but the Board is in fact required to review the veteran's work history when deciding TDIU matters. In addition, the records showing that Mr. Arline worked for DLA for over 37 years and as an expediter for 23 of those years responsible for ordering parts for DOD, that he took a regular retirement, and the September 2015 VA examiner's assessment are relevant evidence for assessing TDIU, even though not provided by a vocational expert. Thus, the Board did not err in relying on that evidence when considering whether to grant TDIU. Nor did the Board take on the role of a competing vocational expert by assessing that evidence or, to the extent that it did, improperly rely on its general knowledge of federal work environments. And, to reiterate, the Court does not find that vocational opinions are equivalent to medical opinions such that *Kahana* applies to vocational matters or that the Board exceeded its competence when assessing the vocational opinion. And we find unpersuasive Mr. Arline's argument regarding retirement, the September 2015 VA examination, his volunteering and church activities, and his memory impairment.

Based on our review of the entire evidence, we are not "left with the definite and firm conviction that a mistake has been committed." *Hersey*, 2 Vet.App. at 94. As there is a plausible basis in the record for the Board's TDIU determinations, we may not substitute our judgement for the Board's and we cannot disturb them. *See Gilbert*, 1 Vet.App. at 53. Because of these determinations, we cannot reach the panel question of what "employment in a protected environment" means. We thank the parties for their additional pleadings, oral arguments, and patience while we reviewed those arguments, the record, and applicable law. But we must reluctantly leave the panel question for another day.[4]

---

[4] Although we do not reach the question of what "employment in a protected environment" means, our dissenting colleague sets forth helpful guidance for assessing the meaning of this phrase.

### III. INCREASED SCHIZOPHRENIA EVALUATION

Finally, Mr. Arline argues that the Board provided inadequate reasons or bases for denying an increased schizophrenia rating higher than 50% before December 7, 2011, because, among other things, the Board did not properly analyze and account for favorable evidence when assessing his credibility. Appellant's Br. at 14-18. Specifically, the veteran asserts that the Board failed to discuss lay evidence explaining why he sometimes underreported his psychiatric symptoms to VA medical professionals and that the Board's oversight in this regard led it to improperly characterize inconsistencies in those reports as "self-serving." *Id*. The Secretary at first disputed this contention, Secretary's Br. at 13-17, but now concedes, consistent with the Court's withdrawn memorandum decision, that the Board provided inadequate reasons or bases for finding the veteran's reports of hallucinations not credible, Secretary's June 16, 2020, Notice at 1-2.

The Court agrees with the parties that the Board erred in this regard. The Board summarily found Mr. Arline's differing reports of hallucinations to be inconsistent, and therefore not credible, R. at 9, without addressing his statements to Dr. Nigl that he downplayed his hallucinations because he was afraid of seeming "crazy" or "strange," R. at 604-05, 1402, 1406, 1435. In *Southall-Norman*, the Court held that, although the Board may find a veteran not credible based on his or her inconsistent lay statements, "it must account for the potentially favorable material evidence of record when doing so," including any evidence that tends to explain away the putative inconsistencies. 28 Vet.App. at 356. Because Mr. Arline's statements to Dr. Nigl tend to clarify the discrepancies in the veteran's reported hallucinations, the Board needed to address those statements before construing the inconsistencies against him. *See id*. The Board's failure to do so rendered inadequate its reasons or bases for finding Mr. Arline not credible based on those putative inconsistencies.[5] *See Caluza*, 7 Vet.App. at 506 (holding that the Board must account for and provide reasons for its rejection of material evidence favorable to the claimant).

Although Mr. Arline asks us to reverse the Board's adverse credibility finding because of this error, Appellant's Br. at 15, reversal is not appropriate because the Board has not properly weighed the veteran's explanations for underreporting his hallucinations with the other record

---

[5] The Board also found that evidence not credible because it was "self-serving," explaining that, "if accepted, [the veteran's reports of hallucinations] would tend to support his appeal for disability benefits." R. at 9-10. The Court reminds the Board that, although it may consider a declarant's interest in assessing the credibility of evidence, *Pond v. West*, 12 Vet.App. 341, 345 (1999), it cannot reject favorable lay evidence just because the claimant offered the evidence, *Cartright v. Derwinski*, 2 Vet.App. 24, 25 (1991) ("The Secretary cannot ignore appellant's testimony simply because appellant is an interested party.").

evidence bearing on his credibility. Remand of the increased schizophrenia evaluation claim is therefore warranted so that the Board can reassess the veteran's credibility based on all relevant evidence of record. *See Tucker v. West*, 11 Vet.App. 369, 374 (1998); *see also Buchanan*, 451 F.3d at 1337; *Wise*, 26 Vet.App. at 526.

## IV. CONCLUSION

Upon consideration of the above, the part of the January 26, 2018, Board decision denying a rating higher than 50% for schizophrenia before December 7, 2011, is SET ASIDE and the matter is REMANDED for readjudication consistent with this decision. The part of the January 26, 2018, Board decision denying TDIU is AFFIRMED.

BARTLEY, *Chief Judge*, concurring in part, dissenting in part: I join part III of the majority decision because I agree that the Board provided inadequate reasons or bases for denying Mr. Arline an increased schizophrenia evaluation. However, because the Board erred in finding Mr. Arline not credible, I cannot join part II of the decision. I would remand the TDIU issue and, because it is so sorely needed, I provide a summary of factors that I believe claimants and adjudicators should use to assess whether employment is occurring in a protected environment under § 4.16.

## I. THE BOARD'S ADVERSE CREDIBILITY DETERMINATION

Mr. Arline's lay statements indicate that his schizophrenia worsened late in his long-term career with a federal agency, causing increasing occupational impairment that his employer, supervisor, and co-workers admirably attempted to accommodate. The Board essentially found this narrative facially implausible, reasoning that no employer would tolerate, and no employee would help, an underperforming disabled veteran as he ended the last stage of a long career. But to be facially implausible, testimony must be so unbelievable that no reasonable factfinder would credit it. *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985); *accord Rucker v. Brown*, 10 Vet.App. 67, 77 (1997) (Steinberg, J., concurring in part and dissenting in part) (explaining that a statement is "inherently incredible" when it "*on its face* is so far beyond the pale of reason that reasonable minds could not but agree that it is incredible"). Mr. Arline's lay statements fall well below that threshold.

22

When the Board finds lay statements facially implausible, it must adequately explain why no reasonable factfinder would believe them. *See City of Bessemer City, N.C.*, 470 U.S. at 575; *Southall-Norman v. McDonald*, 28 Vet.App. 346, 355 (2016). Also, the Board must cite independent evidence to support, or identify an evidentiary foundation for, an adverse credibility determination, *See Cantrell v. Shulkin*, 28 Vet.App. 382, 393 (2017); *Fountain v. McDonald*, 27 Vet.App. 258, 273-75 (2015). The Board did not comply with either of these obligations in addressing Mr. Arline's credibility.

To put it bluntly, the Board went out of its way to impeach the veteran's lay testimony rather than accepting his plausible description of his declining psychiatric state, the corresponding problems it caused with his employment, and the significant accommodations that he received from his employer. Contrary to the Board's finding, there is nothing facially implausible about Mr. Arline's coherent narrative, and the Board in support cites nothing other than its own unsupported view of how workplaces should operate.

Although the Board noted Ms. Grunden's observation that the accommodations reported by the veteran would be unreasonable in most competitive workplaces as evidence that they were implausible, R. at 23-24, the Board fundamentally misconstrued her opinion. Ms. Grunden opined that, in light of her education, professional training, and considerable vocational evaluation experience, the type of accommodations described by the veteran were consistent with and characteristic of her expert conception of employment in a protected environment. At no point did she indicate that the reported accommodations were implausible or otherwise unbelievable. Thus, there is no basis in Ms. Grunden's opinion for the Board's inference that the workplace accommodations reported by the veteran were so extraordinary as to be implausible.[6] To the extent that the Board drew an adverse inference about the veracity of the veteran's statements from this fully supportive opinion without providing reasons for doing so, it erred.

---

[6] Confusingly, the Board suggested that the veteran needed evidence of extraordinary accommodations to establish employment in a protected environment, but determined that his lay descriptions of accommodations were not credible because they were extraordinary. *Compare* R. at 21 (accommodations for volunteer work did not "constitute any extraordinary or unsustainable measures" sufficient "to support a finding" of unemployability), 22 ("The fact that the [v]eteran was able to use accumulated leave to take time off from work does not suggest such an extraordinary accommodation demonstrating that the [v]eteran was unemployable."), 23 (veteran's assertion that he "made errors in his work and had colleagues assisting him with tasks and covering for him when he felt unwell" did "not suggest such an extraordinary accommodation demonstrating that the [v]eteran was unemployable"), *with* R. at 23 (finding not credible the veteran's assertion that his workplace accommodations were "so extraordinary as to amount to him being maintained in employment despite an inability to fulfill his duties").

23

Moreover, I disagree with the majority that Board members should be able to discount TDIU evidence based on their own abstract conceptions, without a foundation in the record, of what is "common" or "general" in a given work environment. *Ante* at 14. Nor, without further explanation, should they be able to rely on written workplace policies that advance procedures counter to a veteran's description of their specific work environment. *Id*. at 14-15. TDIU determinations must be made on the evidence of record, and although the majority states that credibility determinations may not be based solely on extrarecord evidence, *ante* at 14, the remainder of their discussion comes dangerously close to permitting Board members to do just that. Given the importance of employment questions in TDIU cases, I cannot join the majority in allowing Board members to gainsay favorable unemployability evidence based on unsupported beliefs and policies about how a particular workplace should operate. To the extent that such reasoning factored into the Board decision in this case, it also constitutes error.

I would therefore conclude that the Board provided inadequate reasons or bases for finding Mr. Arline not credible and would set aside the Board's denial of TDIU on that basis.

## II. EMPLOYMENT IN A PROTECTED ENVIRONMENT

Section 4.16(a) hasn't changed since the Court in *Cantrell* concluded that the phrase "employment in a protected environment" was ambiguous, 28 Vet.App. at 390, but the Secretary's position has. For the first time he asserts that the phrase is unambiguous and has a specific definition. *See* Secretary's Supplemental Brief (Supp. Br.) at 4. Yet I would find that the phrase remains "genuinely ambiguous," because nothing in the text, structure, history, or purpose of § 4.16(a) clarifies its meaning. *Kisor v. Wilkie*, 139 S.Ct. 2400, 2415 (2019). The regulation doesn't contain an express definition of the phrase and the examples on the non-exhaustive list provided don't point to a definitive meaning. Nor does the structure of § 4.16 or its surrounding regulations; in fact, no other VA disability compensation regulation even mentions "employment in a protected environment," much less defines it. And resort to general and specialized dictionaries doesn't clear up this uncertainty—in fact, regulatory history shows that from the outset the Secretary intended the phrase to be interpreted broadly to capture various types of employment that could be considered protected on a facts-found basis and not to be constrained by any specialized definition. *See* Definition of Marginal Employment in Consideration of TDIU, 55 Fed. Reg. 31,579, 31,580 (Aug. 3, 1990) (final rule); *accord Cantrell*, 28 Vet.App. at 390-91. Section 4.16's purpose of

24

compensating veterans for employability lost due to service-connected disabilities likewise does little to indicate its meaning. In short, the phrase is ambiguous. *See Kisor*, 139 S.Ct. at 2415 (explaining that a phrase is genuinely ambiguous when the "legal toolkit is empty and the interpretive question still has no single right answer").

I would also find, unequivocally, that *Auer* deference is not warranted here. The Secretary's proposed definition is no more than a convenient litigating position. From August 1990 when "employment in a protected environment" was added to § 4.16(a) until March 2020 when the Secretary filed his supplemental brief in this appeal, the Secretary gave the phrase no precise definition, leaving it to VA adjudicators to interpret it in individual cases as they saw fit. Most tellingly, it does not appear that the Secretary took steps to promulgate an official definition after the Court expressly advised him to do so in *Cantrell*, *see* 28 Vet.App. at 392-93, and he only finally offered a definition when it became clear that he had to do so to refute Mr. Arline's specific arguments. Instead of bringing "predictability to the administrative process," one of the justifications for *Auer* deference, *see Kisor*, 139 S. Ct. at 2414, the Secretary's prior refusal to define "employment in a protected environment" has led to repeated litigation and a continued lack of clarity as to what that phrase means. That refusal created unfair surprise in this case, as neither Mr. Arline nor the Board had the benefit of the Secretary's current definition of the phrase when arguing and deciding entitlement to TDIU, respectively. Thus, *Auer* deference to the Secretary's litigating position is certainly not warranted. *See id*. at 2417-18 ("[A] court may not defer to a new interpretation [of a regulation], whether or not introduced in litigation, that creates 'unfair surprise' to regulated parties." (quoting *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 170 (2007))).

Since the phrase is ambiguous and deference is not warranted, I offer the following nonexhaustive grouping of factors, distilled from the parties' briefing, that I hope will assist claimants and VA adjudicators in assessing whether a protected environment exists.

The first group of factors focuses on the employee in the job itself. As Mr. Arline asserts, the type and extent of accommodations that a veteran receives from an employer may be relevant to determining whether employment is in a protected environment. Evidence that a veteran requires substantial accommodations to effectively perform duties suggests a protected environment; evidence of few or less extensive accommodations may weigh against such a finding. Similarly, the magnitude of job responsibilities may bear on that analysis, since some employment is by its very nature inconsistent with a finding of a protected employment.

The second group of factors relates to the employer. The Secretary is correct that employer behavior or intent toward the veteran and employer classification of the position may be relevant considerations. Employer behavior, for example, may indicate that the veteran is shielded from consequences of nonperformance or poor performance of job duties. So, too, an employer's benevolent intent in hiring and promoting a veteran may be relevant. But because there may be reasons other than benevolence for providing a protected environment, employer intent is not dispositive. In addition, evidence that the veteran works for an institutional employer who traditionally provides sheltered employment may indicate a protected environment. For example, an employer like a hospital, VA domiciliary, or long-term care institution, where the goal of employment is principally charitable or rehabilitative, is more likely to offer employment in a protected environment than other enterprises that are profit-motivated.

The third factor is economic. As noted above, although income above the poverty threshold is not determinative, high income may counter against a protected environment while income that only marginally exceeds the poverty threshold may indicate a protected environment.

By identifying groups of nonexhaustive factors that may evince protected employment, I hope to clarify what that inquiry entails and promote consistency and uniformity in an area long bereft of meaningful Secretarial guidance.